# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Hao Zhe Wang
_____

_____
Write the full name of each plaintiff.


-against-

AT&T Inc. and North Lane Technologies Inc.
_____

_____

_____

_____
Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

24 ___CV___ 4198
(Include case number if one has been assigned)

## COMPLAINT

Do you want a jury trial?
  ☑ Yes    ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☐   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

RICO
_____

_____

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                        (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                    (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

| Hao | Zhe | Wang |
|---|---|---|
| First Name | Middle Initial | Last Name |

| PO Box 7075 |
|---|
| Street Address |

| New York | New York | 10150 |
|---|---|---|
| County, City | State | Zip Code |

| 6173206448 | |
|---|---|
| Telephone Number | Email Address (if available) |

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

AT&T Inc.

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

208 S Akard St,

Current Work Address (or other address where defendant may be served)

| Dallas County, Dallas | TX | 75202 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

North Lane Technologies Inc.

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Corporation Service Company, 251 Little Falls Drive

Current Work Address (or other address where defendant may be served)

| New Castle County, Wilmington | DE | 19808 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 4: _____

               First Name              Last Name

               _____

               Current Job Title (or other identifying information)

               _____

               Current Work Address (or other address where defendant may be served)

               _____

               County, City            State           Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:   Massachusetts, New York

Date(s) of occurrence:   2014-present

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

See attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

See attached
_____

_____

_____

_____

_____

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

See attached
_____

_____

_____

_____

_____

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 2024.5.31 | | |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Hao | Zhe | Wang |
| First Name | Middle Initial | Last Name |
| PO Box 7075 | | |
| Street Address | | |
| New York | NY | 10150 |
| County, City | State | Zip Code |
| 6173206448 | | |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## Parties and background

1. Defendant AT&T Inc. is a Delaware telecommunications firm with its principal executive offices located at 208 S Akard St, Dallas, TX 75202.

2. Defendant North Lane Technologies Inc. is a "fintech" specialized in "business disbursements". It is incorporated in Delaware, with a registered agent address at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

3. North Lane has been an AT&T vendor since at least 2019, handling payment disbursements (e.g., refunds to AT&T customers) on the latter's behalf. It was formerly known as Wirecard when it became AT&T vendor and rebranded itself circa 2021. It rebranded itself again as Onbe circa 2023.

4. From 2014 to 2022, AT&T provided cellular service to Plaintiff. Plaintiff switched his cellular service to a T-mobile subsidiary on September 16, 2022.

5. On September 17, 2022, AT&T updated the arbitration agreement in its Customer Service Agreement ("CSA").

6. On September 18, 2022, AT&T closed Plaintiff's account on its end.

7. On November 15, 2022, and following the dispute resolution FAQ on AT&T's website at the time, Plaintiff sent AT&T a Notice of Dispute to signal his intent to pursue claims against against AT&T.

8. On January 17, 2023, and following the dispute resolution FAQ on AT&T's website at the time, Plaintiff sent AT&T and American Arbitration Association the "AT&T-Consumer Demand for Arbitration" form, a filing fee, and a copy of the then-current arbitration agreement.

9. Plaintiff's claims against AT&T in the arbitral process included unfair or deceptive business practices and civil RICO claims.

10. AT&T conceded on April 9, 2024 that Plaintiff was bound not by the post-September 17, 2022 arbitration agreement but by the agreement in force on September 16, 2022. Exhibit 1, hereafter "CSA A".

11. On May 24, 2024, the Arbitrator issued a Final Award, awarding Plaintiff monetary damages and finding §1.3.2.2 and §1.3.2.4 of the arbitration agreement unenforceable. Exhibit 2.

12. Although the Arbitrator conducted a few scheduling conferences with the parties in 2023 to discuss the prospect of joining North Lane to the arbitration, North Lane was never joined.

13. In December 2023, the Arbitrator denied Plaintiff's leave to amend and add claims related to a December 2023 Wall Street Journal exposé that a former COO of North Lane was an agent of a foreign intelligence agency and shared the personal information of its payment card customers with a hostile foreign power. The Arbitrator noted that he made the ruling in light of the impending trial that was scheduled for January 2024, only a month away. The Arbitrator noted that Plaintiff was free to prosecute his claims in a court.

14. Because Plaintiff and the Arbitrator did not know that parties were bound by "CSA A" and did not even get to see its text until 15 months into the arbitration, Plaintiff never raised the issue of the validity and enforceability of the entire arbitration agreement, and the Arbitrator never got to rule on it.

**Plaintiff's AT&T's subscription 2014-September 2022**

15. Plaintiff signed up for AT&T's cellular service at a Massachusetts store in 2014. Despite its relatively high monthly service fees compared to budget cellular services, Plaintiff decided to subscribe to AT&T after its store representatives in Massachusetts talked up AT&T's status as a "big" and premium provider and advertised its supposedly superior network coverage and two other components of service that Plaintiff took particular interest in: international travel features/"add-ons" and a detailed log of service use documented in each monthly statement.

16. While Plaintiff was able to temporarily activate an "add-on" package to his service at the cost of just a few dollars a month to continue his cellular service while traveling abroad in the early years of the service, before he embarked on international trips in late 2021 and 2022 AT&T customer service informed him that his plan was not eligible for such an "add-on" feature and must start to pay a per-minute rate for international roaming.

17. Plaintiff's work also entailed making many phone calls and, importantly, documenting the communications. AT&T's salesperson said that AT&T would offer call and text logs that would come with Plaintiff's monthly statements. Indeed, although AT&T's salesperson suggested that Plaintiff sign up for paperless billing, Plaintiff rejected that option because he preferred not to have his call, text and data logs in a digital format susceptible to tampering. But the logs disappeared from billing statements in 2018.

18. Although the service agreement bound AT&T to notify Plaintiff of important changes to his services, Plaintiff was never notified, for example, of the changes to his account's eligibility of international travel "add-ons".

19. By the time Plaintiff discovered that his AT&T services had degraded, he had no painless option of switching carriers. When he did switch carriers for his family plan in September

2022, he was assigned a few temporary phone numbers on September 16-18 while the
new carrier requested AT&T to port Plaintiff's old numbers, which was done only on
September 18. Before he even attempted the switch, he had also had to get handsets
compatible with T-Mobile's network, get every family member on his AT&T plan in the
same room, and also make prior arrangements for his business and personal affairs and
alert people of the expected interruption to his cellular service. In the end, the switch
imposed significant costs on Plaintiff, not just in terms of devices compatible with the
new carrier but also in terms of disruption to his business and personal life for several
days.

**Plaintiff's overpayment for September 2022 AT&T service and North Lane's debit
cards**

20. AT&T's September 2022 bill that showed only 17 cents in overpayment for about half a
    month of unused service that Plaintiff pre-paid for $109.61.

21. AT&T also delegated North Lane to issue and mail Plaintiff a debit card, purportedly of
    17 cents, which also carried $3 in monthly administration fees. Plaintiff found this
    practice of adding a surcharge to customer refund, especially monthly recurring fees that
    would wipe out the balance of the card many hundred times over and potentially put
    Plaintiff in debt to a third-party vendor that he had never heard of, to be unacceptable.

22. Plaintiff did not attempt to activate the North Lane card. On October 21, 2022, Plaintiff
    contacted AT&T's customer service first via chat and then over the phone to protest both
    the refund amount and the manner in which AT&T issued him the refund. Neither the
    chat agent nor the phone agent was able to make sense of the computer-generated bill.

23. The phone agent then did a back-of-the-envelope calculation and estimated that the Plaintiff overpaid for his September AT&T service by $36.53. She also promised to cut out North Lane and credit the amount to Plaintiff's credit card.

24. For reasons AT&T could not explain at the arbitration trial, after the customer service call ended, the overpayment figure was increased to $37.42 but the payment method again reverted to North Lane debit card.

25. Plaintiff received a second North Lane debit card, purportedly $37.42 in value, in mail in early November 2022. Despite his disappointment in not receiving the promised credit card credit and his annoyance with North Lane debit card's fees, he attempted to activate the card. No matter many times he tried, typing and retyping the card information, the card could not be activated.

26. Plaintiff's experience was not unique. AT&T received many complaints of the very same issue from other customers who received refund in a North Lane debit card that could not be activated, who saw their purported refund wiped out by the fees that come with the card, and who threw up their hands and walked away from the refund money. North Lane was similarly aware of the inundation of complaints about its debit cards that do not activate.

27. During the January 31, 2024 trial, AT&T's witness testified that AT&T indeed retained the capacity of issuing a credit to a customer's credit card. When Plaintiff asked for a paper check to be mailed to him in place of the North Lane card during the customer service call on Oct. 21, 2022, the customer service agent said AT&T "can credit...back to your payment method" and promised to do exactly that.

28. Yet, since at least 2019 AT&T has outsourced the disbursement to North Lane. In countless cases reported by AT&T customers on AT&T's own online forum, customers were steered by AT&T into contacting North Lane, even as AT&T's own agents monitoring the forum learned of the activation problems widely associated with North Lane debit cards as well as the long wait that consumers contacting North Lane were subject to if they wanted to ask for a check in the mail rather than a debit card.

29. AT&T's collaboration with North Lane, therefore, was never prompted by AT&T's inability to process payments and refunds to its customers but rather by Defendants' attempt to profiteer from payment cards that do not activate or charge exorbitant administrative fees – in short, a fraudulent enterprise to skim money from what AT&T owes to its own customers.

30. Stealing from AT&T customers is indeed North Lane's entire business model. This is confirmed by the terms of its vendor contract with AT&T, which features *reverse* payments from North Lane to AT&T. Even after absorbing the significant cost associated with licensing the card from a bank and paying MasterCard to use its network, making and mailing the cards, and dealing with an explosion of angry customers, North Lane was paying millions of dollars to AT&T each years and millions of dollars more just in "signing bonuses" to AT&T when executing and renewing the contract each time.

31. Notably, the ballooning size of North Lane's annual "tribute" to AT&T does not derive from AT&T's success in getting more subscribers. It is down to the simple fact that North Lane was able to cheat a greater percentage of AT&T customers out of their refunds and was thus able to pay AT&T 4.1 cents on the dollar otherwise owed to AT&T customers in North Lane's most recent agreement with AT&T, as opposed to the 2 cent stipulated in

Defendants' earlier contract. Assuming AT&T and North Lane share the spoil equally, we would look at an 8.2% profit margin. If we also account for North Lane's administrative costs, the 8.2% profit margin may well reflect North Lane's confidence in bilking 20-30% AT&T customers out of their refunds. Such a high activation failure rate is *prima facie* evidence of mail fraud on the part of North Lane. AT&T has clear knowledge of its vendor's conduct, as evidenced in its employees' interaction with customers on its website and its readiness to collect its share of the loot each year, so AT&T's steering customers to North Lane, too, is part of the fraud.

32. The continuity and scope of the fraud – and the participation of two entities, each with perfect knowledge of the fraudulent scheme and clear intention to commit the fraud in joining forces in the first place – evidences the existence of a criminal racket.

**North Lane sent payment card customers' personal information to foreign intelligence**

33. In delegating North Lane to issue the two debit cards to Plaintiff and in Plaintiff's name, AT&T furnished North Lane with personal information and data about Plaintiff.

34. A senior executive of Wirecard, its chief operational officer, was recently identified as an agent of foreign intelligence and part-time warlord in a December 15, 2023, Wall Street Journal headline story, "He's Wanted for Wirecard's Missing $2 Billion. He's Now Suspected of Being a Russian Spy." https://www.wsj.com/world/europe/hes-wanted-for-wirecards-missing-2-billion-hes-now-suspected-of-being-a-russian-spy-61d79ee2.

35. The exposé further reveals that the executive gave foreign intelligence wholesale access to Wirecard debit card users' personal information.

36. The most valuable prize for the foreign intelligence appeared to be the personal information of thousands of western spies or spy-catchers, but it is clear that millions of other customers were caught in the information dragnet. And the foreign intelligence is also widely known to undertake operations that are considered financial crimes in western jurisdictions; the personal information of the AT&T customers that would allow Wirecard to verify their identities would also assist in any financial crimes against these customers, including Plaintiff.

37. AT&T's sharing of Plaintiff's personal information thus exceeded the scope of its privacy policy referenced in the preamble of its service agreement with Plaintiff and amounts to a breach of contract.

38. The sharing of Plaintiff's personal information with foreign spies also amounts to an intolerable and reckless invasion of Plaintiff's privacy and left him in real, tangible peril of financial and personal safety. It caused him anxiety and distress and sleepless nights. It also forced him to spend countless hours away from work in the past few months to review his credit and financial transactions in the past two years to review possible breaches or unauthorized activities and to take further actions to safeguard his accounts.

**AT&T's false advertising of its dispute resolution process**

39. In inducing consumers into subscribing to AT&T's services and accepting its terms of service, AT&T advertised on its website that AT&T's legal team would investigate a dispute that its customers submit via its online Notice of Dispute form.

40. Plaintiff filed the dispute notice – and AT&T received it – in January 2024 regarding his concern outlined above about his personal information being leaked or stolen by foreign intelligence through an AT&T's vendor (AT&T Reference No. 00039784).

41. The very next day, AT&T's counsel, Kilpatrick Townsend & Stockton LLP, wrote to Plaintiff that "Our records show no indication of the account being compromised or hacked. AT&T is unable to substantiate your concerns. AT&T has the highest level of security. Finally, our records show no evidence that your personal information was given to a foreign intelligence agency."

42.  Kilpatrick admitted, however, that in responding to Plaintiff's dispute notice in mere 20 hours AT&T made no effort to even request or review any Wirecard/North Lane records of the latter's handling of Plaintiff's data, even though AT&T's agreement with Wirecard/North Lane expressly gives AT&T the power to audit Wirecard/North Lane's database or security systems and logs of Wirecard/North Lane agent or subcontractor who accessed AT&T customer data that AT&T sent to Wirecard/North Lane, as AT&T did with Plaintiff's data.

43. The investigation portrayed in AT&T's advertisement and representation to consumers thus turned out to be a phony and fictitious one. Plaintiff has since had to spend scores of hours away from his work to conduct his own investigation of the scope of the leak of his personal data to foreign intelligence and to take steps to mitigate the potential harm.

**AT&T's Arbitration Agreement and illegal cost-shifting**

44. The Supreme Court has indicated that the failure of an arbitration agreement to "provide [plaintiff] protection from potentially substantial costs of pursuing her federal statutory

claims in the arbitral forum" is a potential ground for finding the agreement

unconscionable. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. at 89-92. In

*Green Tree*, the high court also compared the costs of filing small claims suits in state

courts and the cost of filing fees for consumer arbitration claims in American Arbitration

Association and other arbitral fora and reiterated that the customary consumer-protective

fee arrangements in form arbitration agreements are necessary to the enforceability of the

arbitration agreements under the Federal Arbitration Act.

45. §1.3.2.4 of "CSA A" purported to be precisely such a consumer-protective fee

arrangement. Yet, AT&T mixes its commitment to reimburse the consumer's American

Arbitration Association filing fee (currently at $225) with §1.3.2.2's onerous and

unreasonable requirements on consumers initiating the arbitration proceeding. In the

Final Award, the Arbitrator found §1.3.2.2 to be unconscionable and unenforceable.

Because "CSA A" predicates AT&T's obligation to reimburse the consumer's arbitration

filing fee on §1.3.2.4, the Arbitrator found §1.3.2.4, too, to be unconscionable.

46. The Arbitrator took care to note that he struck down §1.3.2.2 and §1.3.2.4 of "CSA A",

not the post-September 18, 2022 arbitration agreement or still later editions that likely

bind many of AT&T's current customers. Still, §1.3.2.1 of "CSA A" stipulates that

"claims that may arise after the termination of this Agreement" continue to be governed

by "CSA A". As such, "CSA A", now minus §1.3.2.2 and §1.3.2.4, continues to bind

Plaintiff and Defendants.

47. Because AT&T furnished a copy of "CSA A" to Plaintiff and the Arbitrator only shortly

before the Arbitrator was due to write the Award, Plaintiff never raised the issue of the

enforceability of the entire "CSA A" and the Arbitrator never ruled on it. Needless to say,

the arbitration agreement minus the §1.3.2.4 now cuts against the spirit of the Federal

Arbitration Act and the long and settled case law of FAA forbidding expense-shifting.

The arbitration agreement must now be deemed unconscionable and unenforceable in its

entirety.

48. Further, §1.3.2.3 of "CSA A" further stipulates that "[t]he arbitration will be governed by

the then-current Consumer Arbitration Rules ("AAA Rules") of the American Arbitration

Association ("AAA")." In so doing, "CSA A" incorporates the AAA Rules as part of the

arbitration agreement.

49. R28 of the AAA Rules (Exhibit 4) stipulates that "[i]f a party wants an interpreter present

for any part of the process, that party must make arrangements directly with the

interpreter and shall pay for the costs of the service." During the arbitral proceeding,

Plaintiff was asked to furnish a list of witnesses before the trial, and he asked to have a

non-English speaker as a witness at the trial and requested a Mandarin interpreter for his

witness. The Arbitrator ruled that pursuant to AAA Rules Plaintiff must bear the cost of

having the Mandarin interpreter at the trial. Because of the cost, Plaintiff chose not to

have his witness testify at the trial.

50. The venue of the arbitration – and the location of the trial – was Manhattan. In New York,

of course, "the court will provide interpreting services free of charge, in both criminal

and civil matters, for all participants in the process including defendants, parties,

witnesses, victims and those who utilize non-courtroom services provided by the court."[1]

The access to free interpreters – and Mandarin interpreters are among the most readily

available in New York courts – for parties and witnesses in civil trials is codified in Part

---

[1] https://ww2.nycourts.gov/COURTINTERPRETER/index.shtml.

217 of the Uniform Rules for NYS Trial Courts.[2] By contrast, the cost of hiring a private Mandarin interpreter for a one-day trial easily exceeds $1,000. The incorporation of the AAA Rule in "CSA A" thus amounts to a second instance of extreme cost-shifting that should render "CSA A" unconscionable and unenforceable.

51. Additionally, AAA Rule 52(a) says post-award court papers can be served via email. Plaintiff made multiple attempts both before and after May 24, 2024 to get AT&T to agree that by virtue of incorporating the AAA Rules the arbitration agreement indeed allows parties to serve motions pursuant to 9 U.S.C. section 12 to affirm, modify, or vacate award via email. Each time, AT&T has refused to answer or given non-answers, which amounts to repudiation of the arbitration agreement.

**Prayer for Relief**

52. That AT&T bills could not be understood or explained by its own customer service agents – not even by its witness at a trial, someone working in AT&T's Office of the President who has worked for AT&T for a quarter century and has many years of experience testifying for AT&T in consumer litigations – is alarming. While it is perfectly understandable that a big business like AT&T had to generate its millions of bills each month through an automated process, the errors associated with Plaintiff's bill and the possibility that the errors were generated through automation suggests that errors on one particular bill may well have been replicated on other bills. That the bills were impervious to human comprehension and correction cast doubt on the correctness of all other automatically generated bills that AT&T sent to Plaintiff.

---

[2] https://ww2.nycourts.gov/rules/trialcourts/217.shtml.

53. Automation should not excuse AT&T's culpability in mistakes it made in billing Plaintiff. AT&T would be responsible for the design and maintenance of the machines and cannot wash its hands in whatever the machine prints out. Nor can the automation be a defense against fraud and intent: the design and parameters of an automated billing process should be proof of the intent to defraud its consumers through billing. Over the years, AT&T collected about $11,000 in payments from Plaintiff for his AT&T services. Plaintiff is entitled to treble damages for what AT&T charged him under Massachusetts General Law Chap.93A because of the persistent and systematic billing fraud AT&T committed.

54. AT&T's collaboration with North Lane was never prompted by AT&T's inability to process payments and refunds on its own but rather by the Defendants' attempt to profiteer from payment cards that do not activate or charge exorbitant administrative fees – in short, a fraudulent enterprise to skim money from what AT&T owes to its own customers. The fraudulent enterprise made use of USPS mail service, lasted for more than two years, and afflicted itself upon a large number of customers. The continuity and scope of the fraud – and the participation of two entities, each with perfect knowledge of the fraudulent scheme and clear intention to commit the fraud in joining forces in the first place – evidences the existence of a criminal racket. Plaintiff sues North Lane under both federal RICO statutes for $112.26, treble the $37.42 that North Lane was originally supposed to pay Plaintiff. Plaintiff should also be entitled to $1000 in punitive damages under New York GBL §349.

55. Plaintiff sues AT&T and North Lane for emotional damages for their sharing of his personal information with the intelligence operation of a hostile foreign power and for

their violation of AT&T's own privacy policy and for time away from work to investigate and mitigate the impact of the misuse of his personal information and violation of his privacy. Plaintiff sues for damages in an amount to be determined at trial.

56. In addition to monetary damages, Plaintiff demands sufficient, concrete, demonstrable remediation efforts on the part of AT&T and North Lane to mitigate the potential harms to Plaintiff from foreign intelligence operations.

57. Plaintiff sues AT&T for fraudulent advertisement and unfair and deceptive business practice in its representation about how it handles pre-arbitration consumer dispute and in lost time and time away from work in being fooled into taking part in AT&T's sham investigation of the possible theft or sharing of Plaintiff's personal data with a hostile foreign power in January and February 2024 in an amount to be determined at trial.

58. Plaintiff seeks declaratory judgment that the arbitration agreement, through its incorporation of AAA Rule 52(a), allows service through email of motions and related papers that parties file in courts pursuant to 9 U.S.C. section 12 to affirm, modify, or vacate arbitral award.

59. Plaintiff seeks declaratory judgment that the arbitration agreement is unconscionable, null, and unenforceable.

60. Plaintiff also asks for pre- and post-judgment interest, his costs of suit, and such other relief as the Court may deem just and proper.