# Exhibit 2



## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-23-0000-2328

Hao Zhe Wang
        Claimant
-vs-
AT&T
        Respondent

## AWARD OF ARBITRATOR

I, Lawrence Weinstein, the UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, the Claimant being self-represented, and Respondent being represented by Scott Briggs, Esq. of Seki Nishimura & Watase, PLC, at an evidentiary hearing held on January 31, 2024 (the "Hearing"), and in the post-Hearing submissions filed by the parties, do hereby issue this AWARD as follows:

### The Parties

Claimant Hao Zhe Wang ("Claimant" or "Mr. Wang") is a New York resident. Mr. Wang was a cell phone plan customer of Respondent AT&T from 2014-2022.[1]  Mr. Wang signed up for AT&T's plan in 2014 at a Massachusetts AT&T store. Some of his claims in this case are based on Massachusetts law, on the theory he was induced to become an AT&T customer because of false representations the store staff made to him when he enrolled. As discussed in detail in this Award, certain other claims are premised on AT&T's (and a third party's) alleged conduct in the immediate aftermath of Claimant's September 2022 cancellation of his AT&T service agreement. Finally, there are additional claims that involve actions by AT&T during the arbitration agreement's pre-arbitration process, and after the arbitration began.

### The Arbitration Agreement

The specific terms of the parties' agreement to arbitrate play an important role in this Award, and will be discussed  in due course.  For now, it is sufficient to note that the arbitration provisions in Claimant's Customer Service Agreement (the "CSA") require American Arbitration Association ("AAA") arbitration of virtually all disputes between Claimant and AT&T, including each claim in this case. The operative arbitration provisions (Ex. A to AT&T's March 20, 2024 Post-Hearing submission) apply to "all disputes and claims between us, except for claims arising from bodily injury or death."  The arbitration provisions are "to be broadly interpreted," and include all "claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory."  Temporally, the arbitration provision covers the period during which Claimant's customer service plan with AT&T was in place, and also covers claims arising "before the existence of this or any prior Agreement", and "after the termination of

---

[1] Mr. Wang was also an AT&T cell phone customer at some point prior to 2014, but the parties agree his pre-2014 cell phone history has no bearing on this case.

this Agreement." Ex. A, Paragraph 1.3.2.1.  The arbitration provisions apply not only to claims against AT&T, but also to claims against any AT&T's "subsidiaries," "affiliates," "related entities," and "agents."

**Procedural History**

The procedural history of this case is extensive. Claimant believes he is a victim of large-scale fraud and racketeering activities by AT&T and another company with which AT&T had a business relationship. AT&T believes Mr. Wang's claims are frivolous and a shakedown. The parties' vastly different perspectives may explain the near-constant discovery, evidentiary and pleading disputes that took place during this case. Those disputes required me to hold numerous conferences and oral arguments, and to issue nine often lengthy Procedural Orders (not including the original Scheduling Order and subsequent amendments). A brief discussion of these disputes and Procedural Orders will provide useful context to this Award.

Acting in a self-represented capacity, Mr. Wang filed a Demand for Arbitration with the AAA dated January 17, 2023 (the "Demand"). The Demand alleged that Claimant had a cell phone plan with AT&T for eight years, which he cancelled on September 18, 2022. The Demand contended that Claimant was a victim of AT&T's fraudulent billing practices, and also of AT&T's alleged practice of providing refunds in the form of debit cards that could not be activated. Claimant claimed these practices violated the federal RICO statute, state consumer protection laws, and constituted breach of contract. The Demand asserted that Claimant notified AT&T of his intention to seek arbitration on November 11, 2022, more than 60 days before he filed his Demand. The Demand also stated that during the period between the notice of the claim and the commencement of this arbitration, AT&T's legal department neither contacted Claimant, made any settlement offer to him, nor invited him to participate in any informal settlement conference. The Demand sought $75,000 in damages.

Claimant appended to the Demand an arbitration agreement contained in an AT&T Customer Service Agreement. The Demand indicated that Claimant had downloaded the arbitration agreement from AT&T's website (s*ee* Demand p. 1). Claimant later asserted, without contradiction, that AT&T had required him to download AT&T's *then-current* arbitration agreement. Claimant alleges he was unaware at the time, and continued to be unaware until about the time of the Evidentiary Hearing a full year later, that the arbitration agreement he included in his Demand was not the same agreement in force when he was last an AT&T customer.

On February 15, 2023, AT&T asked AAA to administratively close the case. AT&T's grounds for this request were that the arbitration agreement barred Claimant from commencing the arbitration, because Claimant did not comply with the agreement's pre-arbitration notice and informal settlement discussion requirements. In making this argument, AT&T relied on the version of the arbitration agreement appended to the Demand, without informing AAA or Claimant that this agreement differed from the version in place when Claimant closed his AT&T account. Claimant opposed the request for administrative closure. On February 22, 2023, AAA denied AT&T's request, stating it would administer the arbitration absent a contrary judicial or arbitral order.  On March 17, 2023, AAA invited the undersigned to serve as sole arbitrator. After I filed the requisite disclosures and Oath, AAA announced my appointment as arbitrator on April 6, 2023.

A Preliminary Management Conference was held by telephone on April 26, 2023. In addition to the undersigned and the AAA Case Manager, Mr. Wang attended the Conference on a self-represented basis, and Mr. Briggs attended for AT&T. Claimant advised he was considering amending his claims and adding an additional respondent or respondents. I signed the Scheduling Order on May 3, 2023. It set an Evidentiary Hearing date of October 19, 2023, and also (1) gave Claimant until May 17, 2023 to determine whether to add an additional party or parties; (2) gave AT&T until May 24, 2023 to advise whether those entities were affiliates of AT&T or otherwise acted under their control; (3) gave Claimant until June 7, 2023 to amend his claims if he wished to add an additional party or parties; and (4) gave AT&T until June 21, 2023 to file an Answer to the amended claims and any Counterclaim.

Claimant timely disclosed his intention to join two additional Respondents, a company he identified as "Sunrise"

and a company he identified as "Onbe," which previously was called "Northlane."[2]  In its May 24, 2023 filing, AT&T represented that none of those entities are "affiliates of Respondent nor are they controlled by Respondent."  In addition, AT&T renewed its argument that the arbitration should be dismissed because of Claimant's failure to comply with the arbitration agreement's pre-arbitration notice and informal settlement discussion requirements. On June 1, 2023, I issued Procedural Order #1. This Order denied without prejudice AT&T's request to dismiss, and advised the parties they had not yet provided sufficient information to enable me to determine whether Sunrise or Northlane properly could be joined as additional parties.[3]

Mr. Wang timely filed his Amended Claims on June 21, 2023. The Amended Claims purported to add Northlane but not Sunrise as an additional party. AT&T filed its Answer on July 5, 2023. It did not assert any counterclaims. On July 6, 2023, Claimant moved to strike AT&T's Answer, on the grounds that it was overly vague, boilerplate and made in bad faith. On July 7, 2023, AT&T opposed the motion, and on July 11, 2023, Claimant filed a reply. On August 11, 2023, I issued Procedural Order #3. This Order denied Claimant's motion to strike, both for non-compliance with the Scheduling Order's prerequisites for filing a motion, and on the merits. The Order also required the parties to meet and confer on all outstanding information-sharing issues and disputes. One such issue involved the sharing of information bearing upon whether Northlane was a related entity or agent of AT&T, and thus amenable to joinder under the terms of the arbitration agreement.

Meanwhile, as the scheduled October 19, 2023 Evidentiary Hearing date approached, the parties' exchanged witness lists. However, the parties made little to no progress in resolving their discovery and pleading disputes, including regarding Northlane's possible joinder and AT&T's objections to Claimant's witness list.

Consequently, I directed the parties to appear for a telephone conference on October 11, 2023, at which these issues were discussed. At the conference, the parties and I agreed the case was not ready for an evidentiary hearing, due to the ongoing discovery and joinder disputes. On October 13, 2023, I issued Procedural Order #4 to memorialize rulings made at the October 11 conference. That Order adjourned the October 19, 2023 Evidentiary Hearing, and directed the parties by October 18, 2023 to propose a new Hearing date or dates for December 2023 or January 2024. The Order also directed Claimant, by October 18 (1) to explain what information about Northlane's relationship with AT&T it still needed to make a case for joinder; (2) to provide authority supporting joinder if I were to conclude Northlane acted as AT&T's agent; (3) to explain how Northlane is liable to Claimant and how Claimant was injured by Northlane's alleged conduct; and (4) to explain why Claimant needed to call each witness on his witness list (apart from witnesses who were friends or family members).

The parties timely filed the letters required by Procedural Order #4, and Claimant filed a short reply to AT&T's letter. Meanwhile, the parties remained unable to resolve their discovery and pleading disputes, prompting me to schedule yet another telephone conference and oral argument for December 13, 2023 to decide the disputes and the joinder issue, and to set a new Evidentiary Hearing date.

On December 16, 2023, I issued Procedural Order #5, which confirmed rulings I made at the December 13 argument and conference. As Procedural Order #5 explained in detail, the Order (1) denied joinder of Northlane; (2) denied without prejudice Claimant's demand to call as corroborating witnesses AT&T employees who he communicated with directly[4]; (3) denied without prejudice AT&T's request for leave to file a dispositive motion; (4) set the new Evidentiary Hearing date for January 30, 2024 (later moved to January 31, 2024); and (5) set a

---

[2] For ease of reference, I refer to the Onbe/Northlane entity as "Northlane".

[3] Procedural Order #1 also called for a telephone conference to discuss what additional information could be provided to assist me in determining whether joinder would be proper and appropriate. That conference took place June 7, 2023, and on June 14, 2023, I issued Procedural Order #2, which specified that Claimant could add the additional parties to the amended claims due June 21, 2023, *subject to my later decision whether joinder was proper and appropriate.* The Order also gave AT&T until July 5, 2023 to respond to the amended claims and to object to the addition of any third parties.

[4] I denied Claimant's witness demand based on AT&T's concession that it would not dispute Mr. Wang's testimony about what AT&T employees said to him, and instead would limit its defense to the legal relevance of any such statements and, in the case of written or audiotaped statements, Claimant's interpretation of the meaning and relevance of the AT&T employee statements.

date for AT&T to respond to a discovery letter Claimant filed on December 14, 2023.

On January 14, 2024, I issued Procedural Order #6, which decided various discovery, joinder and procedural disputes. This Order: (1) denied certain of Claimant's discovery requests as overbroad, and because Claimant previously had the opportunity to narrow those requests but chose not to[5]; (2) denied Claimant's request to further amend his claims on the grounds that the request was made too late in the case, and the subject matter of the proposed new claims was far afield from the claims previously made; (3) directed that the Evidentiary Hearing be transcribed; and (4) permitted Claimant's Mandarin-speaking witness to testify by affidavit.[6]

On January 26, 2024, I issued Procedural Order #7, which addressed the parties' discovery submissions permitted under Procedural Order #6. The January 26 Order noted that neither party's submissions complied with Procedural Order #6's limitations, and that the parties could renew their arguments at the Evidentiary Hearing.

A one-day Evidentiary Hearing took place January 31, 2024. With the parties' consent, the Hearing was hybrid—Claimant, AT&T's witness Jennifer Sharp, the court reporter, and I attended the hearing in person at the AAA's office in Manhattan, and ATT's counsel Mr. Briggs appeared via Zoom. Mr. Wang testified on his own behalf, and was cross-examined by Mr. Briggs. Mr. Wang also introduced the affidavit testimony of his father and business partner, Wang Zhen Hua.  AT&T's Specialist Project Manager Ms. Sharp was AT&T's sole witness. Mr. Wang cross-examined Ms. Sharp, but did not quite complete his cross by the end of the hearing day. In response to my question, Mr. Wang represented that the rest of his cross concerned AT&T's conduct after Claimant notified it of his intent to arbitrate. I informed the parties I was uncertain whether I had adequate information to issue a final Award in this case, including on the issues Mr. Wang wished to pursue on cross.[7] I stated that I wanted to review the Hearing transcript, and likely would then ask for post-hearing submissions before deciding whether any more testimony or oral argument was necessary.

There was a delay in receiving the hearing transcript, and on March 14, 2024, I issued Procedural Order #8. In that Order, I directed AT&T, by March 19, 2024, to provide Claimant and me with a copy of the arbitration agreement in effect when Claimant cancelled his AT&T service plan in September 2022, along with an explanation of whether, and how, AT&T's arbitration agreement at the time Claimant filed his January 2023 Demand differed from the earlier version. In addition, Procedural Order #8 directed Claimant to file by March 28, 2024 a letter setting forth, for each claim for which he sought monetary relief (1) what contractual term, statute or other law AT&T violated; (2) how such violation damaged or injured Claimant; (3) what amount of damages Claimant sought for each such violation, and the basis for same; and (4) how Claimant reconciled his requests for relief with any limitations on remedies in the CSA. AT&T was given until April 9, 2024 to respond.

After the parties timely filed the submissions Procedural Order #8 directed, Claimant on April 13, 2024 requested leave to file a reply submission. He also asked for additional discovery and to disqualify AT&T's counsel. In an April 15, 2024 submission, AT&T opposed Claimant's requests. On April 16, 2024, I issued Procedural Order #9, which granted Claimant leave to file a reply submission, and denied his additional discovery and disqualification motions. Procedural Order #9 also provided that upon Claimant's filing of his reply, the Evidentiary Hearing would be declared closed. Claimant filed his reply on April 24, 2024, and on April 29, 2024, AAA declared the hearing closed as of April 24.

**Claimant's Claims for Relief**

Claimant's operative pleading is his June 21, 2023 Amended Claims. As Mr. Wang acknowledged, his claims for relief fall into three buckets: (1) claims based on false representations AT&T made in 2014 to induce him to sign up for its cell phone service; (2) AT&T's (and Northlane's) actions in the immediate aftermath of Claimant's

---

[5] Nonetheless, the Order gave Claimant a final opportunity to identify any specific documents he believes he needed to prove his claims and to explain how those documents are relevant to specific claims Claimant asserted. The Order also permitted AT&T to respond to any submission Claimant made on this issue.

[6] The grounds for these rulings are described in detail in the Order, which is part of the record of this case.

[7] Ms. Sharp, the witness Claimant cross-examined, was not a percipient witness on the subject of the remaining cross.

cancellation of his service plan in September 2022; and (3).AT&T's conduct during the arbitration agreement's pre-arbitration notice and informal dispute resolution period, and after the arbitration commenced.

Regarding his fraudulent inducement claims, Mr. Wang alleged that AT&T's Massachusetts sales representatives induced him to rejoin the AT&T network with statements that AT&T was a premium provider with superior coverage, and that his cell phone plan package would include two items allegedly vital to his business needs. Those two items were certain "international travel features/'add-ons,'" and documented call logs appearing on each monthly statement. Amended Claims Paragraphs 3-9. Mr. Wang alleged that each of those representations proved to be false (*see id.*), and claimed damages of (1) "approximately" $11,000 under the Massachusetts consumer protection statute (Mass. General Laws Chapter 93A)—the $11,000 figure represented the entirety of Claimant's "subscription" payments during the eight year period from 2014-22 in which he was an AT&T customer (Amended Claims Paragraph 8); (2) punitive or treble damages under Chapter 93A (Amended Complaint Paragraph 8); and (3) "compensation of $40,000 for lost time and time away from work," due to hours "spen[t] on the phone with AT&T's technical support to fix routine issues of network signals and with its customer service to get his call/text logs in printed form or to dispute his eligibility for other account features." *Id.* Paragraph 9.

Regarding the second "bucket" of claims—AT&T's and Northlane's actions in the immediate aftermath of Claimant's cancellation of his service plan--the Amended Claims asserted the following: (1) that upon cancelling his contract in the middle of the month, he was entitled to a refund of "more than a third of the billing cycle in a month that he already paid for in full" (*id.* Paragraph 10); (2) that instead, AT&T informed him that his refund was only "a few pennies," and that it would be provided in the form of a debit card issued by [Northlane] for which he would be charged $3 in monthly fees (*id.* Paragraphs 11-12); (3) that he was forced to spend extensive time protesting the amount of the refund and its delivery mechanism; (4) that it became clear AT&T's billing system was so dysfunctional that even its customer service representatives and supervisors could not understand it (*id.* Paragraphs 13-17); (5) ultimately AT&T authorized Claimant to receive a $36 refund, which an AT&T supervisor promised would be credited to Claimant's credit card; (6) instead, Claimant received the refund via a Northlane/Sunrise debit card; and (7) Claimant was never able to activate it, despite extensive efforts. *Id.* Paragraphs 18-20. The Amended Claims contended that Mr. Wang's experience was not unique, but instead was the subject of complaint by "a large number of customers." The Amended Claims characterized the AT&T relationship with Northlane in which the latter issues unusable debit cards as a vehicle for refunds, as a "fraudulent enterprise," and a "deliberate and conscious" barrier for customers who wish to terminate their AT&T subscriptions. *See id.,* Paragraphs 21-24. The Amended Claims further characterized the AT&T/Northlane debit card refund program as "a racket" and "racketeering activity," for which Claimant is entitled to treble damages, although it is not clear what amount Claimant believed should be trebled. *Id.,* Paragraph 25.

Finally, the Amended Claims devoted 17 paragraphs to Claimant's third "bucket" of claims—AT&T's conduct during the arbitration agreement's pre-arbitration process and the arbitration itself. In a nutshell, Claimant contended that AT&T violated Sections 1.3.1 and 1.3.2.2 of the arbitration agreement, and that Claimant "suffered loss of time as a result." Amended Claims Paragraph 26. Specifically, the Amended Claims alleged (*id.,* Paragraph 28) that in the 60 days after Claimant notified AT&T of his intention to file an arbitration, Claimant "repeatedly reached out to AT&T to ask for a settlement discussion and was rebuffed even an opportunity to be in touch with an AT&T attorney, as mandated in Section 1.3.1" of the arbitration agreement. Claimant maintained (*id.,* Paragraph 29) that he spent "more than 50 hours" preparing for the settlement discussions that never occurred, and sought "damages suffered for lost time and time away from work in excess of $20,000." *Id.* In addition, Claimant contended he suffered monetary loss due to AT&T's alleged failure to reimburse him for the $225 AAA filing fee. *Id.,* Paragraph 30. Lastly, the Amended Claims sought a declaration that Sections 1.3.2.2 and 1.3.2.4 of the arbitration agreement are unconscionable and unenforceable. *See* Amended Claims Paragraphs 31-42.[8]

---

[8] Less than a month before the January 31, 2024 Evidentiary Hearing, Claimant sought to add a claim based on an alleged privacy breach that Claimant stated he first learned about from a Wall Street Journal article published in December 2023, which Claimant speculated could have resulted in the passing of Claimant's "personal information to a foreign intelligence agency." Claimant's request for leave to amend his claims was denied for the reasons stated in Procedural Order #6.

**AT&T's Defenses**

In its July 5, 2023 Answer, AT&T asserted a general denial and nine affirmative defenses. The affirmative defenses were: failure to state a claim (First Affirmative Defense); the CSA's lack of proration clause limits or bars Claimant's recovery (Second Affirmative Defense); Claimant's Massachusetts Consumer Protection Act claims are barred for failure to send AT&T a compliant written demand letter (Third Affirmative Defense); and the AAA lacks jurisdiction to hear this case due to Claimant's failure to comply with Section 1.3.2.2 of the arbitration provisions, and even if AAA has jurisdiction, Claimant's failure to comply bars him from recovering the alternative remedy provided by Section 1.3.2.5 (Fourth Affirmative Defense). In addition, AT&T's Answer asserted that Claimant's Amended Claims are barred by applicable statutes of limitations (Fifth Affirmative Defense); that any damages Claimant incurred were not the fault of AT&T (Sixth Affirmative Defense); waiver, estoppel and voluntary payment (Seventh Affirmative Defense); Claimant's recovery should be reduced by any applicable offsets (Eighth Affirmative Defense); and failure to mitigate damages (Ninth Affirmative Defense).

**The Arbitrator's Conclusions**

I have carefully considered the parties' pleadings and live witness testimony; the affidavit testimony of Claimant's father and business partner; the entirety of the January 31, 2024 Evidentiary Hearing Transcript, including the Exhibits offered into evidence or otherwise put before me prior to, during and after the Evidentiary Hearing; the parties' post-Hearing submissions; and the cases, statutes and other authorities cited by the parties. After due consideration of all of the above evidence, documents and other materials, I reach the following conclusions.

        **The Arbitration Agreement**

In any arbitration, an arbitrator's first order of business is to review the relevant arbitration agreement to confirm his or her jurisdiction to hear the dispute, decide the Award, and assess the limits, if any, the arbitration agreement imposes on the Award's permitted scope. Here, there is no dispute that Claimant and AT&T were parties to an arbitration agreement that required them to resolve virtually every dispute they might have, and certainly each of the claims in this case, through arbitration. Less clear until very recently, is which arbitration agreement governs this proceeding. It turns out AT&T was in the habit of periodically modifying its standard consumer arbitration agreement. It apparently did so multiple times between 2014, when Claimant signed up with AT&T, and January 2023, when Claimant commenced this arbitration. I did not know until the Evidentiary Hearing that the arbitration agreement appended to Claimant's Demand was not the same agreement Mr. Wang was bound by when he cancelled his AT&T cell phone plan in September 2022. Apparently, Mr. Wang did not know this either. In its April 15, 2024 Post-Hearing Submission, AT&T makes light of this issue. But I view AT&T's failure to timely disclose this fact to be a serious matter. To be clear, I do not hold Mr. Briggs responsible for the confusion, but his client should have clarified this issue at the outset of the case, not its final stages.

After all, AT&T's website tells customers wishing to arbitrate that they should upload the *current* version of the arbitration agreement with their Demand. Mr. Wang's testimony confirmed this, and AT&T did not dispute it. AT&T's instruction is perfectly appropriate for would-be claimants who are current AT&T customers bound by the current version of the arbitration agreement. But the instruction is inappropriate and confusing when the claimant is a former customer like Mr. Wang, whose arbitration rights and obligations are governed by a different version of the agreement. AT&T cannot reasonably assume Mr. Wang would know the arbitration agreement attached to his Demand was not the relevant agreement. Therefore, it was AT&T's duty to disclose this fact to Claimant and to AAA at the beginning of this case, and I am disappointed it did not do so.

It is important to note a few provisions of the arbitration agreement in place in September 2022 when Mr. Wang cancelled his AT&T plan. In addition to the provisions cited or quoted on pp. 1-2 of this Award, Section 1.3.2.2, entitled Pre-Arbitration Notice of Dispute, calls for any party intending to file a claim to first provide the counterparty with a Notice of Dispute. This Notice "must include" the Claimant's name and account number; "the services (if any) to which your claim pertains;" a "description of the nature and basis of the claim or dispute;" an

"explanation of the specific relief sought and the basis for the calculations;" and the Claimant's signature.[9] Section 1.3.2.2 further provides that if "AT&T and you do not reach an agreement to resolve this claim within 60 days after the Notice is received, you or AT&T may commence an arbitration proceeding. (If either you or we send the other an incomplete Notice, the 60-day period begins only after a complete Notice is received)."

Section 1.3.2.4, entitled Arbitration Fees, provides that if a claimant initiates "arbitration of claims valued at $75,000 or less, AT&T will pay all AAA filing, administrative, case-management, hearing and arbitrator fees, so long as you have fully complied with the requirements in section 1.3.2.2 for any arbitration you initiated."

Section 1.3.2.6, entitled Requirement of Individual Arbitration, provides that an arbitrator may award relief "only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim."

Section 1.7, entitled Limitations of Liability, provides that the customer "acknowledge[s] and agree[s] that AT&T has the right, to the greatest extent provided by applicable law, to limit the scope and extent of its liability to you," and that accordingly, "to the greatest extent permitted by applicable law . . . AT&T is not liable to you for any indirect, incidental, special, consequential, treble, punitive, or exemplary damages for any reason.  Disallowed damages include, but are not limited to, damages for . . . loss of revenue, business, profits [or] goodwill . . . ."

Finally, Section 1.3.2.5 is entitled Alternative Payment and Attorney Premium. It provides that if "you fully complied with the above requirements of section 1.3.2.2 and the arbitrator issues an award in your favor that is greater than the value of AT&T's last written offer made before the arbitrator was selected, then AT&T will pay you . . . the amount of the Award or $10,000", whichever is greater.

### Credibility Assessment

Before discussing my findings and conclusions about Claimant's claims, a brief discussion about Mr. Wang's credibility is warranted. Some of his claims, and most if not all of AT&T's defenses, revolve around the meaning of written words, whether contained in contracts, business records and other documents, or in transcripts of recorded conversations. But other claims rely, at least in part, on statements that were made by Mr. Wang to AT&T personnel, or to him by AT&T personnel. In that regard, Mr. Wang is a "percipient witness," the term used for a witness who personally engaged in conversations with others virtually, by phone, or face to face, and later testifies about what the witness said to those people, and what they said to him. In many disputes, both sides present percipient witness testimony, and often enough, their testimony contradicts each other.

Here, Mr. Wang was the only percipient witness; AT&T did not offer the testimony of any witness who participated in any conversation Mr. Wang testified about to contradict Mr. Wang's testimony. As the trier-of-fact, I am tasked with evaluating witness credibility, and I am not required to credit Mr. Wang's testimony about conversations in which he participated, just because no other witness contradicted him. Nonetheless, I found Mr. Wang's testimony about events he personally saw and heard to be consistently credible. I have no reason to doubt his version of the conversations with AT&T personnel about which he testified.

However, my conclusion that Mr. Wang was honest and credible in testifying about what he saw and heard is only the beginning of my consideration of the merits of his claims. I now turn to an examination of the claims themselves, and whether the evidence and the law support them.

### Claimant's First Bucket of Claims

As previously noted, Mr. Wang's Amended Claims alleged three categories of false statements made to him in 2014 by staff at a Massachusetts AT&T store that induced him to sign up at that store for an AT&T cell phone plan: (1) that AT&T was a "premium" cell phone service that "provided superior network coverage"; (2) that Claimant could use "international travel features/ "add-ons"" that would enable him to make calls while traveling

---

[9] Additional information was required of Claimants who were represented by counsel, which Mr. Wang was not.

internationally for "just a few dollars a month"; and (3) that he would get "a detailed log of service use documented in each monthly [billing] statement." Amended Claims, Paragraph 3.

According to Claimant, the "superior network coverage" representation was untrue because Claimant "discovered that [AT&T's] network coverage was often poorer than its competitors." He gave as an example a situation in which his car broke down on a mountainous road at a spot where there was no AT&T coverage, forcing him to abandon his car and trek down the road in search of an AT&T signal. *Id.*, Paragraph 4.

Claimant acknowledged the international travel feature worked as represented in "the early years of the service." *Id.*, Paragraph 5. However, he claims that "before embarking on international trips in late 2021 and 2022," AT&T informed him he could not use the "add-on" feature, that instead he must pay per-minute roaming charges, and that his account actually was never eligible for the add-on feature. *Id.* He also claimed that the call logs disappeared from his monthly bills in 2018 or 2019, causing him to complain to AT&T. He says he was told that he could request those logs, but he only received them once, and then "never again." *Id.*, Paragraph 5.[10] In his March 28, 2024 Post-Hearing Submission, Claimant contended he eventually learned he lost both the international travel and call log features in 2018 (*see id.* at 1), and that AT&T "took away these features without alerting" him.

I credit Mr. Wang's testimony that an AT&T representative or representatives made the statements in 2014 that he attributed to them. AT&T argues that even if those statements were made, Mr. Wang's claims based on those statements are barred by the 4-year Statute of Limitations applicable to Mass. G.L. Chapter 93A. I disagree. To begin with, it is an open question whether Statute of Limitations defenses apply to arbitrations, absent arbitration agreement language that mandates their applicability. But even if the Chapter 93A Statute of Limitations does apply, it is an affirmative defense AT&T has the burden to prove. AT&T has not met that burden.

First, Mr. Wang admitted on cross-examination that no one at the AT&T store in 2014 promised he would be entitled forever to any of the features he was promised, and he repeated that concession in his March 28, 2024 Submission (at p. 1). Mr. Wang testified without contradiction that he received the promised international travel and call log benefits for a time; in the case of the travel feature, he only learned in late 2021 or 2022 that he was not eligible for that feature, and it was not until 2018 or 2019 that he stopped receiving call logs as part of his monthly statement. These facts make application of the Statute of Limitation much more complex. It would require consideration of facts related to possible tolling of the Statute, and when Claimant could reasonably have been on notice of the changes. AT&T did not provide adequate evidence of these facts, if any evidence at all, and therefore has failed to prove its Statute of Limitations defense as to any of Mr. Wang's "first bucket" of claims.

Turning to the merits of those claims, I first address the claim that AT&T falsely promised Claimant he would receive premium cell phone service that provided superior network coverage. I conclude that Claimant does not come close to satisfying his burden of proof on that claim. First, the AT&T's store representative's reference to AT&T's cell service as "premium" is a classic example of non-actionable "puffery." In this context, "puffery" refers to statements in advertising that are so general and non-specific that they cannot be proven true or false, and therefore cannot reasonably be relied on by a consumer as a statement of fact.  Objectively, a statement that services are "premium" does not say anything sufficiently specific about the quality or features of that service as to cause a reasonable consumer to be misled by the reference. Consequently, regardless of how Mr. Wang subjectively might have construed the statement that AT&T has a "premium" cell phone service, that statement as a matter of law is not false advertising, much less fraudulent advertising.

The salesperson's statement that the AT&T service "provided superior network coverage" also might be deemed "puffery." The questions "how do you measure what superior network coverage means?" and "superior to what?" leap to mind. Consumers want and like a myriad of aspects of cell phone service. Thus, what constitutes "superior network coverage" reasonably may mean very different things to different consumers. That is especially so where,

---

[10] Claimant acknowledges he learned at some point that he could receive the call logs in digital format, but he claimed this format didn't suit him, plus the logs could only be accessed for 16 months, not 24 months as was the case when he received them as part of his monthly statement. *Id.*

as here, the statement attributed to the salesperson does not explain in what respect or respects AT&T's coverage is supposedly superior, or identifies which other cell phone service providers ATT's coverage is superior to. It is simply not the law that a single consumer's subjective dissatisfaction with his cellphone service can transform a salesperson's boast that her company provides "superior network coverage" into an actionable claim of false advertising or fraud within the meaning of Chapter 93A.

In any event, even if we assume "superior network coverage" is capable of being proven false or fraudulent, Claimant has failed to do so here. Claimant's evidence, if the Amended Claims is our guide, is that in one instance, Claimant's car broke down on a mountainous trail in an area where he could not get a cell signal, and that in other situations, he encountered unspecified issues that required calls with customer service and technical personnel. These are merely anecdotes, not proof that in general, or across the board, AT&T's network coverage is inferior in any specific metric compared to one or more competitors. So, Claimant cannot prevail on this claim.

The analysis is different for Mr. Wang's claims that he was promised (1) international travel add-ons that allowed him to make calls while traveling internationally at a limited cost, and (2) call logs as part of his monthly statements. These statements are not puffery—they are quite specific, and capable of being proven true or false. And, they were clearly important to Mr. Wang—he testified credibly about why these features were meaningful and necessary for his business, and why they induced him to join the AT&T network.  But that is not the end of the analysis. Importantly, at the time those statements were made to Mr. Wang, they were true—Claimant concedes he received the international travel and call log benefits he was promised for several years thereafter.

Years after Mr. Wang became an AT&T customer, the company changed its policies, without the courtesy of an advance warning to Mr. Wang. And, due to the intermittent nature of Mr. Wang's international travel schedule and the Covid epidemic, he did not find out about AT&T's changes to his international travel rights until long after the policy change went into effect, on the eve of an international trip. I accept as true that this left Mr. Wang unable to change his carrier or his AT&T plan in time to avail himself of a low cost international call feature for that trip. Moreover, the features AT&T discontinued were important to his original decision to choose AT&T over other carriers. This clearly upset Mr. Wang. Although some, maybe most, AT&T customers were not inconvenienced by these changes, the discontinued features mattered to Mr. Wang, and the fact he received no advance warning about the changes obviously enhanced his dissatisfaction with AT&T.

Unfortunately, not every injustice, perceived or actual, has a legal remedy. With that in mind, I now turn to the question of whether Claimant's contract with AT&T, or any statute cited by Claimant, affords him any recourse for AT&T's policy changes, other than to cancel his cell phone plan and switch carriers, as he eventually did. I start by finding that the AT&T salesperson's representations to Mr. Wang in 2014 were not false when they were made, much less fraudulent. (For a statement to be fraudulent, it is not enough that it is false or misleading. Instead, it either has to be intentionally false—in other words, the speaker must have known it to be false when she made it—or made with reckless disregard for its truth or falsity). Here, when the sales staff told Mr. Wang in 2014 that his plan would include international travel add-ons and the ability to receive call logs with his monthly statements, those statements were truthful at the time, and remained so for several years. The fact that AT&T changed its policies years after the statements were made does not make those statements false retroactively.

This analysis might have been different if Mr. Wang had been promised that AT&T's policies would never change as long as he remained an AT&T customer. But credit to him, he candidly admitted that he did not receive that promise. Thus, any law premised on false advertising or false representations simply does not apply to the statements made to Mr. Wang at the Massachusetts AT&T store in 2014.

In his Post-Hearing submissions, Mr. Wang would have me penalize AT&T for not giving him advance notice of its international travel and call log policy changes before implementing them. I do not doubt it would have been better corporate practice for AT&T to have done so—it is obvious, after all, that Mr. Wang's disappointment at these changes was magnified by feeling blindsided by them.  But I am not persuaded AT&T had any legal or contractual obligation to make the advance disclosures, or that Mr. Wang presented sufficient evidence that AT&T's failure to do so caused him any injury. For example, it is possible Claimant's last-minute realization in late 2021 or 2022 that he was no longer eligible for low-cost calls while traveling internationally forced him to

pay more for his international calls while on that particular trip.  But Claimant introduced no evidence of what extra cell phone expenses he incurred on that trip, if any, and I have no ability to fill in the blanks.

Claimant does not tether his contention that AT&T owed him an advance disclosure obligation on any contractual language in the CSA. Instead, he argues that AT&T's obligation arises from the fact that there is a "Significant barrier to unsubscribing" from AT&T's cell phone plan, which barrier is "prohibitively high." March 28, 2024 Post-Hearing Submission at 2. I cannot agree with Claimant's position about barriers to switching. First, Claimant does not point to anything AT&T does or did to make unsubscribing difficult. To the contrary, AT&T persuasively points to the facts that its contract with Claimant permitted him to discontinue services at any time; that when Claimant did request discontinuance, it was accomplished the same day it was requested; and that if any delay occurred in restoring service with Claimant's new carrier, no evidence was introduced that AT&T was responsible for it. *See* AT&T April 9, 2024 Post-Hearing Submission at 3-4, and record citations therein. In addition, although switching cell phone plans, particularly family plans, can be inconvenient, Claimant's characterization of the cost of plan switching as "prohibitively high" is belied by Claimant's own evidence that he was able to accomplish the switch in a single weekend. March 28, 2024 Post-Hearing Submission at 2. That is not a level of inconvenience that imposes strict liability on AT&T for failing to disclose in advance the international travel and call log changes to Claimant, at least in the absence of specific evidence showing that the lack of disclosure caused Claimant discrete financial injury. Claimant introduced no such evidence.

### Claimant's Second Bucket of Claims

As previously noted, Claimant's second "bucket" of claims relates to alleged conduct by AT&T and Northlane in the immediate aftermath of Claimant's September 18, 2022 cancellation of his cell phone plan.  In a nutshell, the Amended Complaint alleged that a few weeks before cancellation, Claimant paid in advance and in full his bill for the entire month of September. He believed that after cancelling the plan mid-month, he was entitled to a pro rata refund covering the portion of the billing period after the cancellation date. We are not talking about a large amount of money here—AT&T represents that the billing cycle covered August 29-September 28, 2022, a 31 day period, and that the amount Claimant paid for the entire cycle was $109.61. AT&T April 9, 2024 Post-Hearing Submission, at 4. Doing the math, the billing cycle was 31 days, so Claimant's monthly payment represented a per diem cost of $3.54/per day, rounded to the second decimal point. Thus, a pro rata refund would either be $35.40, if one excludes September 18, the day Claimant cancelled his plan, or $38.94, if the refund included September 18. There is, by the way, no record evidence about how either side believes the refund should have been calculated. That is because Claimant is demanding far more than this amount, and AT&T does not believe Claimant was entitled to a refund at all, although AT&T did refund him this approximate amount.

In all events, Claimant learned soon after he cancelled the plan that AT&T's records showed he was entitled to a credit of only "a few pennies" (there is also a record reference to 17 cents), and that AT&T would not provide the refund by crediting his credit card. Instead, it provided this tiny refund via a debit card that came with a $3 monthly fee, many times the value of the card. Amended Claims, Paragraphs 11-12.

Claimant protested both the amount and the method of payment. *Id.*, Paragraph 13. He contends that neither the AT&T customer representative with whom he spoke, nor the representative's supervisor, could understand AT&T's initial calculation of his credit balance. He stated that the supervisor offered him a refund either of $36, or around $36. *Id.*, Paragraphs 13-15. Claimant also contended that after he protested the debit card vehicle, the supervisor agreed to credit the refund to his credit card. Instead, he received another debit card. He claims he tried on multiple instances to access the card, but was unable to do so. *See id.*, Paragraphs 15-21.

Claimant asserts that AT&T's inaccurate initial credit calculation, the fact that its employees could not understand how the calculation was arrived at, and AT&T's insistence that the $36 payment was a courtesy credit, not a refund, together constitute proof of a "persistent and systematic billing fraud." *Id.*, Paragraphs 16-17. This fraud, in Claimant's view, entitles him to treble damages under Mass. Chapter 93A. *Id.*

Claimant also contends AT&T's use of non-functioning debit cards to process refund payments is a "fraudulent enterprise" and "criminal racket," which Claimant dates back to mid-2021 or before. *Id.*, Paragraph 23. He claims

that besides his own experience with such a debit card, there were "a large number" of other AT&T customers who were victimized, and that his experience "was not unique." *Id.*, Paragraphs 21, 23. Claimant alleges Northlane was also an active participant in this fraud. *See id.*, Paragraphs 21-25.

Claimant asserts that under both the Federal RICO statute and New York GBL Section 49, he is entitled to punitive damages against both AT&T and Northlane for their fraudulent debit card scheme. *See* March 28, 2024 Post-Hearing Submission at 7.

AT&T disputes any obligation to issue Claimant a partial refund after his mid-cycle cancellation, but it asserts it provided multiple refunds that made Claimant whole. First, AT&T states that the refund contained in the debit card was for $37.42, more than Claimant at the time alleged he was owed. *See* AT&T April 9, 2024 Post-Hearing Submission at 5. Although Claimant maintains he was never able to activate the card, AT&T argues that Claimant never contacted AT&T for help in doing so. *Id.* at 5. AT&T also maintains it separately reimbursed Claimant via a credit to his credit card in the amount of $36.40 on November 17, 2022—an amount slightly higher than what Claimant demanded in his Notice of Dispute to AT&T that same day. *Id.* Finally, AT&T asserts that on February 22, 2023, it offered Claimant an additional $109.61 in settlement, representing the total amount of his invoice for the month during which he cancelled his plan. *Id.* at 5-6. Claimant did not accept that offer.

The problem with Claimant's second bucket of claims is not where those claims start, but where they finish. I agree with Claimant that even though the parties' contract does not provide cell phone plan customers with the right to a refund when they cancel their plan in the middle of a monthly billing cycle, the evidence shows that AT&T often offers a partial refund under those circumstances, and that it made such an offer to Claimant. I also agree with Claimant that AT&T's original invoice for the month in which he cancelled his cell phone contract was erroneous, and that AT&T representatives could not figure how AT&T's billing system came up with the original credit calculation. And I accept Claimant's allegation that the second debit card was defective, such that Claimant could not access it. But this is where I part company with Claimant's argument.

By the time he filed his Demand in this case, Claimant had come to the conclusion he was entitled to recover more--far more, in fact—than any under-crediting of his account when he cancelled it.  In his Demand, Claimant alleged entitlement to a recovery of $75,000--$35,000 for AT&T's "unlawful gain in payments it collected from me as well as punitive damages," and $40,000 for his "loss of time associated with [his] extended efforts to deal with various aspects of AT&T's fraudulent billing and customer service practices." Then in his Amended Claims, Claimant sought (1) disgorgement of all the money he paid in his monthly bills during the entire eight years he was an AT&T customer, an amount he listed as "about $11,000," plus unspecified punitive damages; and (2) $40,000 "for lost time and time away from work as a result of often long and otherwise productive hours that he had to spend on the phone with AT&T's technical support to fix routine issues of network signals and with its customer service to get his call/text logs in printed form or to dispute his eligibility for other account features."

But these theories of recovery run headlong into Section 1.7 of Claimant's CSA, entitled Limitations of Liability, as that provision existed when Claimant cancelled his contract with AT&T. In pertinent part, Section 1.7 provided that "to the greatest extent permitted by law, AT&T and its . . . agents . . . are not liable to you for any indirect, incidental, special, consequential, treble, punitive, or exemplary damages, for any reason. Disallowed damages include, but are not limited to, damages for personal injury, property damage; or loss of revenue, profits, business, goodwill, use, data, or other tangible or intangible      losses. . . . resulting from, for example, (a) use of AT&T products and Services . . . ;(b) the performance or nonperformance of AT&T Services; (c) the actions or inactions of AT&T or its agents with respect to the provision or delivery of any AT&T Services or that relate to your AT&T Account or AT&T Services or our relationship with you. . . ."

Limitation of liability provisions are common features of consumer contracts, and they are generally enforceable. Moreover, the language of the limitation of liability clause in Claimant's contract with AT&T is straightforward—on its face, it would bar the claims in Mr. Wang's second bucket for punitive or treble damages. It would also bar his claim for $40,000 for lost time and time away from work, as that claim seeks both business damages and incidental damages. Whether it would bar his $11,000 disgorgement claim is less clear, but even assuming Section 1.7 does not bar that claim, it fails for a different reason. In seeking recovery of all monthly

amounts he paid AT&T under their 8-year long contract, Claimant necessarily is alleging he received no value from the contract—otherwise, his claim would constitute a demand for enhanced, punitive or exemplary damages, which Section 1.7 forbids. But Claimant did receive some value from the contract. For at least the first four years, he received two services that were important to him, the international travel features and the call logs. Plus, I have already ruled against his first bucket of claims, and his $11,000 disgorgement claim would be totally disproportionate to any actionable, direct injury he suffered as a result of AT&T's or Northlane's alleged actions or inaction in the immediate aftermath of his contract cancellation. So that claim fails as well.

Finally, for the sake of completeness, I also conclude that Claimant did not plausibly allege, much less prove, any fraudulent conduct on the part of AT&T or Northlane related to his "bucket 2" claims. Claimant's evidence regarding AT&T's initial accounting error in his case, and its use of an inoperative debit card as a refund vehicle in his case, simply does not create any inference of fraud against him or against AT&T's customers at large. I do not doubt the sincerity of Mr. Wang's beliefs, but his evidence is sorely lacking. And without evidence of fraud, there is no basis to decline to apply the limitation of liability provisions of the parties' contract.[11]

### Claimant's Third Bucket of Claims

Claimant's third "bucket" asserts claims arising out of (1) AT&T's actions during the period between Claimant's November 2022 submission to AT&T of his Notice of Dispute and his January 2023 commencement of this arbitration, and (2) AT&T's motion asking AAA to dismiss this case prior to my appointment, on the ground that AAA was barred from exercising jurisdiction because of the alleged inadequacy of Claimant's Notice of Dispute. As noted earlier in this Award, in assessing these claims, we look to the arbitration agreement in place when Claimant cancelled his cell phone plan on September 18, 2022, not to the revised version of the agreement AT&T had begun using by the time Claimant filed this arbitration in January 2023.

For purposes of this third "bucket," the relevant provisions of the arbitration agreement in effect when Claimant cancelled his plan are Sections 1.3.2.2, 1.3.2.3, and 1.3.2.4. In pertinent part, Section 1.3.2.2 requires a customer or former customer seeking to bring an arbitration against AT&T to first serve AT&T with a Notice of Dispute, which must contain certain specified information, including "a description of the nature and basis of the claim or dispute," and an "explanation of the relief sought and the basis for the calculations." Further, Section 1.3.2.2 effectively prevents the commencement of an arbitration until 60 days after the Notice of Dispute is received by the non-noticing party, and contains language, which could stand to be more precise, providing that if the Notice of Claim is "incomplete", the 60-day period does not begin running until 60 days after a "complete" Notice of Claims is provided.

Section 1.3.2.3 provides for AAA arbitration under the AAA's Consumer Rules, and further provides that "an arbitrator's ruling will not be binding in arbitrations involving different customers." Finally, Section 1.3.2.4 provides, in pertinent part, that if Claimant's claims are for $75,000 or less, "AT&T will pay all AAA filing, case-management, hearing and arbitrator fees," but only so long as the Claimant has complied with Section 1.3.2.2.

Claimant filed a Notice of Dispute with AT&T more than 60 days before he commenced this arbitration. He asserts that in reliance on frequently asked questions on AT&T's website, he believed he was entitled to engage in settlement discussions with an AT&T lawyer during the 60-day pre-arbitration window, and spent extensive time preparing for those discussions. But he claims AT&T would not put him in touch with any AT&T lawyer. Instead, the only AT&T personnel who reached out to him was neither a lawyer nor a legal assistant.

After commencing this arbitration by filing his Demand with AAA, Claimant was notified by Mr. Briggs that the Demand contained several claims and requests for relief that were not contained in the Notice of Dispute. *See* Claimant Exhibit 11. According to AT&T, the new claims in the Demand retroactively made the Notice of

---

[11] Should Claimant contend that the reason he did not have proof of fraud was because he was denied sufficient discovery, that argument puts the cart before the horse. Arbitration is not court, and as I previously held in procedural orders and at oral arguments in this case, discovery is limited in arbitrations. One simply cannot use the arbitral discovery process to search for evidence of fraud that is supported solely by speculation and questionable inferences.

Dispute incomplete. Citing to Section 1.3.2.2 of what we now know was the modified arbitration agreement that took effect after Claimant was no longer an AT&T customer, Mr. Briggs' letter took the position that on that basis, AAA may not accept or administer the Arbitration Claimant had just commenced. Within a few days of Mr. Briggs' letter to Claimant, AT&T asked AAA to discontinue the arbitration. As noted at the outset of this Award, AT&T's motion to AAA relied on and cited AT&T's then current arbitration agreement, not the one that bound Claimant at the time he was last a AAA customer. AAA denied AT&T's motion. I was thereafter appointed as arbitrator, and the case proceeded.

I agree with AT&T that any FAQ's that caused Claimant to believe he would have the opportunity to engage in settlement negotiations directly with an AT&T lawyer were not part of the arbitration agreement in place when Claimant cancelled his AT&T plan. They thus did not create any contractual rights in favor of Claimant or any obligations for AT&T. Accordingly, I deny the part of Claimant's third bucket of claims that seeks a remedy for the time Claimant spent preparing for settlement negotiations with an AT&T counsel.

In addition, Claimant asks me to hold Section 1.3.2.2 and 1.3.2.4 unconscionable and unenforceable. *See* Amended Claims Paragraph 31. Here, I agree with Claimant, although I can only do so partially. Section 1.3.2.3 of the arbitration agreement, which Claimant does not address in Paragraph 31 of his Amended Claims, provides that an arbitrator's ruling "will not be binding in arbitrations involving different customers." This restriction is not only sensible but imperative. My role as arbitrator is limited to this dispute between Claimant and AT&T, and does not extend to any disputes AT&T may have with any other current or former customer, even concerning the same subject matter. Thus, to the extent Claimant asks me to render a decision as to the enforceability of Sections 1.3.2.2 and 1.3.2.4, I will do so (a) only with respect to the version of the arbitration agreement in effect when Claimant cancelled his cell phone plan on September 18, 2022, and (b) only as to how to the provisions of that agreement affect Claimant's third "bucket" of claims, not any other customer or former customer's claims. Thus, I make no ruling about any subsequent version of AT&T's arbitration agreement, or about any other former or current customer of AT&T.

As to Mr. Wang, I find it would be unconscionable to read Section 1.3.2.2 of the arbitration agreement as rendering his Notice of Dispute incomplete. I find that his Notice of Dispute was complete and sufficient at the time he filed it in November 2022. I further find that his January 2023 commencement of an arbitration containing a Demand which made additional claims and requests for relief not present in his Notice of Dispute did not, and reasonably could not, retroactively invalidate his Notice of Claim.

The overarching purpose of the parties' arbitration agreement was to further the public policy favoring the arbitration of disputes that Congress long ago adopted in enacting the Federal Arbitration Act. Section 1.3.2.3 of the arbitration agreement provides for arbitration under the AAA's Consumer Rules. The AAA Consumer Rules vest extensive discretion in the appointed arbitrator to set the schedule for each case. That discretion includes determining what claims and requests for relief parties may make and setting the deadlines for making them. It cannot be that a Respondent can block or impair this exercise of the Arbitrator's discretion, by forcing the dismissal of an arbitration because the Claimant asserts claims in his demand (or in amended claims) that vary from those listed in the pre-arbitration Notice of Dispute. Yet that is precisely what Section 1.3.2.2 would accomplish if construed as AT&T argues. Stated differently, the ultimate determination of what claims and requests for relief a Claimant can make in an arbitration, and what the deadline is for making them, rests solely with the arbitrator, not the Respondent. Thus, as relates to Mr. Wang, his January 2023 decision to add claims and requests for relief beyond those listed in his Notice of Dispute cannot result in the dismissal of his arbitration on the grounds that these additions violated Section 1.3.2.2 and rendered his Notice of Claim incomplete.

In like manner, Claimant is correct that the value of AT&T's commitment in Section 1.3.2.4 to pay all the arbitration costs and fees for non-frivolous claims collectively valued at $75,000 or less would be severely undermined if the decision whether a Notice of Dispute is "complete" is left to AT&T. There is an enormous disparity in resources between AT&T and its individual customers, and AT&T's commitment to pay all the costs and fees of any non-frivolous arbitration case where the damages sought do not exceed $75,000 gives its customers a cost-effective means of obtaining recourse against AT&T. But conditioning (or threatening to condition, as AT&T did here) its obligation to pay these costs and fees on their customers having to forego the

right to make any additional claims or requests for relief after AT&T is served with the Notice of Dispute could have a severe chilling effect on its customers' exercise of their right to arbitrate,  The fact that AT&T wound up paying Claimant's fees and costs in the end does not minimize the inappropriateness of its threatening not to do so.

This brings me to the question of whether there is any monetary remedy to which Claimant is entitled as a result of  my ruling in favor of Claimant on his claims relating to Sections 1.3.2.2 and 1.3.2.4. I find there is an appropriate monetary remedy.

First, Mr. Wang's claims addressing AT&T's actions during this arbitration fall within the scope of the arbitration agreement. AT&T explicitly intended that whether a claim is arbitrable is to be "broadly interpreted." Moreover, AT&T drafted the agreement to cover "claims arising out of or relating to any aspect of the relationship between us," including "claims that may arise after the termination of this Agreement."  *See* Section 1.3.2.1.

Second, I agree with Claimant that AT&T's invocation and interpretation of Section 1.3.2.2 in this case was unconscionable and unfair as applied to Claimant for the reasons discussed above. And I further find that AT&T (1) acted inappropriately in making its motion to dismiss in reliance on a different version of the arbitration agreement than the one that governed AT&T's relationship with Mr. Wang; and (2) compounded that error by failing to disclose this fact to AAA in its motion to dismiss the arbitration, and failing to disclose this fact to Mr. Wang or the arbitrator for nearly a year.  I do not agree with AT&T that the two arbitration agreements are substantively identical. Claimant's Exhibit 11 proves this. Exhibit 11 is an email from AT&T's counsel to Claimant informing Claimant that his recently filed arbitration must be dismissed for failure to comply with Section 1.3.2.2, The *only* language in the email AT&T's counsel chose to italicize was the statement that the "**AAA may not accept, administer, assess, or demand fees in connection with such an arbitration. If the arbitration already is pending, it must be dismissed**" (emphasis in the original). That statement is found only in the amended version of Section 1.3.2.2, not in the version that Mr. Wang was bound by.

I have no doubt AT&T's reliance on Section 1.3.2.2 --and the wrong version of this Section at that--substantially prolonged and increased the scope and cost of this arbitration. Claimant was first forced to address AT&T's meritless argument that AAA should dismiss the arbitration at the outset of the case, before an arbitrator was appointed. Later, AT&T renewed the motion after I was confirmed. I denied the motion without prejudice, but Claimant was forced to spend time dealing with it again. Finally, AT&T's extremely belated disclosure of the fact that there actually were two different arbitration agreements, caused Mr. Wang to have to engage in additional correspondence, and later briefing, to bring these new facts and their ramifications to the arbitrator's attention.

Earlier in this Award, I ruled that the limitation of liability provision of the CSA barred Mr. Wang from claiming damages *to his business* in the form of hours Mr. Wang spent away from work addressing problems regarding AT&T services or billing. But this is a very different situation. Previously, Claimant was seeking damages for business injury, which are barred by the CSA's limitation of loss provision. Here, however, I am awarding a small sum to Claimant to recompense him personally for the time spent in bringing to my attention AT&T's unconscionable conduct. That conduct, had Claimant not uncovered it and called AT&T out, could have deprived Claimant of a fair hearing in this case.

My award to Claimant in connection with his efforts to uncover AT&T's inappropriate conduct in this aspect of the arbitration is $2,000. As previously noted, Section 1.3.2.5 of the Agreement states that "if you fully comply with the requirements above in subsection 1.3.2.2 and the arbitrator issues an award in your favor that is greater than the value of AT&T's last written settlement offer made before the arbitrator was selected, then AT&T will pay you . . . the amount of the award or $10,000 (the Alternative Payment), whichever is greater . . . and pay the attorney you retained, if any, twice the amount of attorney's fees reasonably incurred . . . ."

I find that Claimant did fully comply with Section 1.3.2.2, as I construed it above. I find that the value of AT&T's last written settlement offer before I was selected as arbitrator was $109.61. That offer was made on February 22, 2023 (AT&T April 9, 2024 Post-Hearing Submission at 6). I was invited to serve as arbitrator on March 17, 2023 and my appointment was confirmed on April 6, 2023. Because my award to Claimant of $2,000 exceeds the

14

amount of AT&T's last settlement offer prior to my appointment, Claimant is entitled to an Award of $10,000 pursuant to Section 1.3.2.5.

**Monetary Award**

Claimant is entitled to an Award of $2,000 for the reasons stated above, which under the terms of Section 1.3.2.5, is increased to $10,000. Those amounts are not cumulative. No interest is awarded. AT&T did not assert any Counterclaims in this matter.

As to Mr. Wang's claims on which I ruled in favor of AT&T, I do not find that he brought any of those claims in bad faith. Consequently, and because I have ruled that Claimant brought this arbitration in compliance with Section 1.3.2.2 of the arbitration agreement, I conclude, pursuant to Section 1.3.2.4 of that agreement, that no costs shall be awarded to AT&T, and that AT&T's administrative fees and my compensation shall be borne by AT&T as incurred.

The American Arbitration Association's administrative fees of $3,950 shall be borne as incurred, and the compensation of the arbitrator totaling $7,500 shall be borne as incurred.

All of the above sums that remain unpaid as of the date of this Award shall be paid on or before 7 days from the date of this Award.

The Award is in full settlement of all claims submitted in this Arbitration by or against any party.  All claims by or against any party not expressly granted herein are hereby denied.


Dated:  May 24, 2024

*Lawrence Weinstein*

_____

Lawrence Weinstein, Arbitrator